UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kasenia R., by and through
her Parents and next best
friend, M.R. and C.B.

     v.                     Civil No. 05-cv-0292-JL
                                 Opinion No. 2008 DNH 207
Brookline School District

**O R D E R**

The parents of a learning and emotionally disabled child have challenged the New Hampshire Department of Education's decision rejecting their claim that the Brookline School District ("the District") failed to provide their daughter with an appropriate education in violation of the Individuals with Disabilities Education Act ("IDEA"). See 20 U.S.C. § 1415(i)(2). The parents ask the court to reverse the decision and order the District to reimburse them the costs associated with their daughter's education at a private school in Massachusetts.

The court has jurisdiction over this appeal under 28 U.S.C. § 1331 (federal question) and 20 U.S.C. § 1415(i)(2)(A) (IDEA). After oral argument and a review of the evidence before the court, the court grants judgment in favor of the District for the reasons stated below.

I.  **APPLICABLE LEGAL STANDARD**

In New Hampshire, the parents of a disabled child who they believe has been denied a "free appropriate public education" (or, "FAPE") can request an impartial due process hearing before the New Hampshire Department of Education.  See 20 U.S.C. § 1415(f)(1)(A).  Following that hearing, the hearing officer must issue a final decision, accompanied by findings of fact.  See id. §§ 1415(h), (i)(1)(A).  If either the parents or the school district is dissatisfied with the hearing officer's decision, that party may seek judicial review in state or federal court.  See id. § 1415(i)(2)(A).  The court reviewing the decision must then make a bounded, independent ruling based on the preponderance of the evidence.  See Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008); see also 20 U.S.C. § 1415(i)(2)(C)(iii).

The court's role in reviewing the hearing officer's decision is "one of involved oversight."  See Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993).  The applicable standard is an intermediate one under which the court must exercise independent judgment, but, at the same time, "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard."[1]  See Lessard, 518 F.3d at 24.

---

[1] Purely legal questions arising under the IDEA are reviewed de novo.  See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st

> The required perscrutation must, at one and
> the same time, be thorough yet deferential,
> recognizing the expertise of the
> administrative agency, considering the
> agency's findings carefully and endeavoring
> to respond to the hearing officer's
> resolution of each material issue.  Jurists
> are not trained, practicing educators.  Thus,
> the statutory scheme binds trial courts to
> give 'due weight' to the state agency's
> decision in order to prevent judges from
> imposing their view of preferable educational
> methods upon the States.

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)

(internal citations and punctuation omitted) (quoting Bd. of Educ.

v. Rowley, 458 U.S. 176, 207 (1982)); see also T.B. v. Warwick

Sch. Comm., 361 F.3d 80, 83-84 (1st Cir. 2004).  The party

challenging the hearing officer's decision bears the burden of

proving that the decision is wrong.  See Schaffer v. Weast, 546

U.S. 49, 51 (2005).[2]  To carry that burden, the moving party must

do more than simply point to the existence of procedural

irregularities.  See Roland M., 910 F.2d at 991; see also Gonzalez

v. P.R. Dep't of Educ., 254 F.3d 350, 352 (1st Cir. 2001) (noting

that a district court, faced with conflicting expert testimony,

_____

Cir. 2002).

[2] Contrary to the Supreme Court's holding in Schaffer, which
was decided subsequent to the due process hearing relevant to this
case, the hearing officer improperly placed the burden of proof on
the District, the non-moving party.  See 546 U.S. at 51.  This
court will not disturb the hearing officer's burden allocation--
which, in any event, favored the parents--for the purpose of this
appeal, but will nonetheless hold the plaintiffs to their
appellate burden to demonstrate an erroneous ruling.

may justifiably feel "bound to affirm" the state agency's
determination).

## II. <u>BACKGROUND</u>[3]

In 1998, M.R. and C.B. ("the parents"), then-residents of
Brookline, New Hampshire, adopted six year-old Kasenia R.
("Kasey") and her two sisters from Russia and brought them to live
in the United States.  The District is the school district which
encompassed Brookline and in which Kasey was at least sporadically
enrolled.

### A.    <u>The initial individualized education program ("IEP")</u>[4]

For several years following the adoption, Kasey's parents
alternated between home-schooling her and enrolling her in public
elementary school in Brookline.  In public school, Kasey's

---

[3]  Under the IDEA, the "court reviews the administrative
record, which may be supplemented by additional evidence from the
parties . . . ."  <u>See</u> <u>T.B.</u>, 361 F.3d at 83.

[4]  An IEP is a written document detailing the student's
present educational level, the short-term and long-term goals of
the plan, the specific services to be offered, and a set of
objective criteria for later evaluation.  <u>See</u> 20 U.S.C. §
1414(d)(1)(A); <u>Lessard</u>, 518 F.3d at 23.  Under the IDEA, the IEP
must provide each disabled student with an educational program
tailored to his or her individual needs, <u>see</u> 20 U.S.C. §
1400(d)(1)(A), and each student must be offered special education
and related services "as are necessary to permit the child to
benefit from the instruction."  <u>Rowley</u>, 458 U.S. at 189; <u>see also</u>
20 U.S.C. § 1401(29).

teachers observed that she was a diligent worker and, despite occasional emotional issues and difficulty paying attention, made academic progress in her classes.  (Administrative Record [hereinafter "AR"], SD Doc. 1008).  By the fourth grade, however, Kasey's parents became concerned that she may require special education and requested that the District evaluate her.  The District, responding to the parents' request, enlisted various teachers, clinicians, and psychologists to assess Kasey's mental and emotional capabilities.  Following their evaluations, these specialists met with Kasey's parents and representatives from the District (collectively, the "IEP team"),[5] and together they agreed to diagnose Kasey as learning disabled in math--specifically, mathematical reasoning and calculation--and suffering from Reactive Attachment Disorder, an emotional disability negatively affecting her relationship with her caretakers.  At the IEP team's suggestion, and based on the results of its evaluations, the District (1) offered to place Kasey at the Mont Blanc Academy

---

[5] "The common practice is to form a team of parents, teachers, school administrators, and others to evaluate a child with a disability and, if she is found eligible for remedial services, to develop an IEP."  C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 283 (1st Cir. 2008); see also 20 U.S.C. §§ 1414(d)(1)(B) and (d)(3).  Kasey's IEP team included her parents, several psychologists (Dr. Edwin Goodall, Dr. Carol Houde, and Dr. Kay Seligsohn), a doctor specializing in intellectual functioning (Dr. John Willis), a speech pathologist (Julie Goulet), a clinical social worker (Kate Bernier), and several of Kasey's teachers and school administrators.

("Mont Blanc"), a small private school in Hooksett specializing in educating learning disabled children, and (2) formulated an IEP, which, based on the information the District had available, was intended to address Kasey's diagnosed disabilities.  Kasey's parents agreed to both of the District's proposals.  (AR, SD Docs. 1397-98, 1401-19).

**B.    Fifth grade at Mont Blanc:  2003-2004**

Kasey attended Mont Blanc for the fifth grade under a series of agreed upon IEPs intended to guide her education through October 29, 2004.  Under these IEPs (collectively, the "Mont Blanc IEP"), which all offered similar educational services, Kasey was "mainstreamed" with nondisabled students, but received special education services, particularly with respect to her math and social skills, and was offered the assistance of a school counselor, private therapist, guidance counselor, and psychologist as necessary.  (AR, SD Docs. 1401-19, 1470-97, 1827-54). According to her Mont Blanc teachers, these IEPs enabled Kasey to make appropriate educational progress while enrolled at their school.  Soon after the spring semester commenced, however, Kasey's mother and the director of Mont blanc had a heated and public falling out, each accusing the other of abuse and neglect of Kasey.  Following this altercation, both sides agreed that Kasey's future education would not be at Mont Blanc; the parents

withdrew Kasey from school, and Mont Blanc refused to take her
back.

The District quickly convened an IEP team meeting to address
Kasey's future placement, and, after some discussion, offered to
immediately enroll her at the Captain Samuel Douglass Academy
("Douglass Academy"), the local public elementary school.  Kasey's
parents, doubting whether the teachers at this school possessed
the mental health background needed to meet Kasey's particular
needs, asked instead that she be placed at the Regional Services
and Education Center ("RSEC")--a private day school in Amherst--on
a trial basis.  Before the District had a chance to decide on
whether RSEC was an appropriate placement for Kasey, her parents
requested a due process hearing before the New Hampshire
Department of Education,[6] claiming that Kasey had been denied a
FAPE for the preceding five years.  They asked that the District
be ordered to provide "compensatory educational services" as
reimbursement for the home-schooling they had been forced to
provide.  After hearing from both sides, the hearing officer
dismissed the parents' complaint on various grounds.  (AR, SD Doc.
10070-71).

---

[6] In the days after Kasey's parents requested the due process
hearing, the District applied for Kasey to be enrolled at the
RSEC.  Notwithstanding these efforts, Kasey's parents went forward
with the hearing.

7

For the remainder of Kasey's fifth grade year, and into the following summer, Kasey was home-schooled by her parents while the sides argued over where she would attend school when the sixth grade began in the fall.  The District, having already applied for Kasey to attend RSEC, proposed that she attend Douglass Academy until the RSEC made a final decision on her application.[7]  Her parents objected to such a temporary placement, claiming that Douglass Academy was ill-prepared to address Kasey's disabilities, and therefore incapable of providing her with an adequate and appropriate education.  Unable to agree on Kasey's placement, the District requested, as allowed under New Hampshire law, that a hearing officer mediate their dispute.  See  N.H. Code Admin. R. Ann. Ed. 1120.05(c) (permitting the school district to request a due process hearing where the parents have refused to consent to its proposal).  In preparation for that hearing, Kasey's parents sought to have her evaluated at the District's expense by Dr. Foad Afshar, a certified school psychologist, to try and determine "why Kasey has difficulty learning and how to help her." (AR, SD Doc. 10091).  The District again acceded to the parents' request and agreed to fund the evaluation, subject to several reasonable

---

[7] RSEC eventually accepted Kasey into its summer program, but rejected her as a full-time student for the 2004-2005 school year because it deemed she would not be a good fit, particularly because the school generally did not accept students with Kasey's emotional disabilities.

conditions.[8]  Dr. Afshar, however, was unable to conduct a

complete evaluation of Kasey in advance of the requested hearing.

The hearing officer thus delayed her decision until additional

information could be gathered:

> Testimony and documentary evidence
> reviewed make clear that [Kasey] will not
> benefit from, but likely will be harmed by,
> another temporary placement.  When [Kasey]
> returns to schooling with other children, it
> must be a permanent placement.  It is
> determined that too many questions regarding
> [Kasey]'s diagnoses and needs remain
> unanswered[.]  Therefore, no change of
> placement will be ordered until the
> information necessary is gathered.
>
> The testimony by [Dr.] Foad Afshar at
> hearing was limited to the general because of
> time requirements[,] but the questions raised
> must be answered before a placement decision
> can be made . . . . It is ordered that the
> evaluation, as described in the Afshar
> evaluation proposal, be performed within
> forty-five days.

(AR, SD Docs. 10160 and 10162).  The hearing officer indicated

that, once Dr. Afshar's evaluation was complete, she would issue

her final decision on "whether schooling at [Douglass Academy] in

Brookline is feasible and, if not, what schooling is appropriate

---

[8]  The District imposed three conditions on Dr. Afshar's
evaluation:  (1) the cost of his evaluation must be reasonable,
(2) as part of his evaluation, he must review Kasey's records, and
(3) as part of his evaluation, he must "interview and obtain
information from a variety of individuals familiar with Kasey,
including her parents, teachers and other relevant people who
worked with her."  (AR, SD Doc. 10163).

for [Kasey]."  (AR, SD Doc. 10162).  Until a final placement decision could be made, however, Kasey was ordered to be home-schooled.

**C.   Sixth grade at Douglass Academy:  2004-2005**

An unintended consequence of the hearing officer's ordered delay, which was designed to bring clarity to Kasey's educational needs and stability in her future placement, was that it exacerbated an already contentious relationship between the District and her parents.  Soon after the District agreed to fund Dr. Afshar's proposed evaluation, the sides began to dicker over, among other topics, the scope of the evaluation ordered by the hearing officer, whether the District would be allowed access to Dr. Afshar's evaluation records, and the conditions the District wished to impose on his evaluation.  Ultimately, after the parties were unable to agree on these issues, Dr. Afshar concluded that he would "not be permitted the professional courtesy and latitude to conduct an independent evaluation" and refused to continue with his evaluation of Kasey.  (AR, SD Doc. 10245-46).  The hearing officer's placement decision was thus further delayed until an evaluator could be identified to complete Dr. Afshar's work.

Per the hearing officer's order, Kasey's parents home-schooled her at the beginning of the sixth grade, but by late-

September had enrolled her at Douglass Academy,[9] where she was again educated under the provisions of the Mont Blanc IEP.  But as this IEP was scheduled to expire on October 29, 2004, and because the evaluation ordered by the hearing officer still was not complete, Kasey's parents proffered Dr. Ronald Federici, a doctor located in Virginia, as a candidate to replace Dr. Afshar.  The parents asked the District to fund Dr. Federici's evaluation, including the family's travel costs to and from Virginia, and warned that if the District did not respond to their request by the following day they would "file for a hearing to prevent any further delays."  (AR, SD Doc. 10304).  Before the District could make its decision, the parents requested another due process hearing before the New Hampshire Department of Education.[10]

### D.    **The November 5, 2004 IEP**

In the weeks after Kasey's parents requested the hearing, the District held the first in a series of IEP meetings intended to assess Kasey's academic status and, despite the fact that Kasey still had not undergone the full evaluation ordered by the hearing

---

[9]   The parents allege that they enrolled Kasey in public school because the District had threatened to file truancy charges, claiming that Kasey either had to be registered with the state as a home-schooled student, see N.H. Rev. Stat. Ann. 193-A, or enrolled in public school.

[10]   This hearing request was eventually withdrawn once the District agreed to fund Dr. Federici's evaluation.

officer, formulate an appropriate IEP.  At these meetings, Kasey's parents advocated for an IEP that would allow her to spend the entire day in a small class setting and objected to her being pulled out of class for specialized instruction.  (AR, SD Docs. 10365-69).  They also questioned whether Kasey interacted with too many adults over the course of an ordinary school day, and suggested that she would benefit from teachers with a sophisticated understanding of her special needs.  See id.  The IEP team responded that since returning to school Kasey had adjusted well to the classroom setting, was making appropriate academic progress, and had integrated well with the other students.

At an IEP meeting on November 5, 2004, the District, in an attempt to address the concerns raised by Kasey's parents, discussed an IEP that would:  "mainstream" Kasey at Douglass Academy; allow her to attend specific classes in the school's smaller, less congested resource room; allow Kasey to see fewer teachers by permitting her to skip certain classes; and appoint Dr. Gaston Blom to complete the pending, previously ordered evaluation.  (AR, Transcript of 11/5/04 IEP meeting, at 5, 24, 48-51).  With respect to specific special educational services, the District offered Kasey:

- one hour per week of special education in math,
- one hour per week of special education in study and organizational skills,

12

- one hour per week of individual and family therapy,
- 30 minutes per week of individual training for social skills,
- 30 minutes per week of group training for social skills,
- 30 minutes per week of occupational therapy consultation,
- 30 minutes per week of occupational therapy monitoring, and
- the assistance of special education staff, guidance staff, an occupational therapist, and a social worker.

(AR, Vol. 13, Parents' Exhibit No. 6). The District explained to Kasey's parents that the proposed IEP was based solely on the information it had available to it at the time, and that once Kasey was fully evaluated the team would reconvene to determine whether the IEP needed to be amended. (AR, Vol. 16, Transcript of 11/5/04 IEP meeting, at 20, 22-23). The District left open the possibility that, despite its preference for enrolling Kasey in the least restrictive placement appropriate for her special needs, it would consider placing her at a special day school once her evaluation was complete. Id. Citing the same concerns they had raised at prior IEP meetings, Kasey's parents rejected the proposed IEP and refused to allow Dr. Blom to complete the evaluation begun by Dr. Afshar.

## E.  **Settlement agreement**

While they were not able to agree upon an IEP, Kasey's parents and the District were able to come to terms on a settlement agreement. As part of this agreement, the District

13

agreed both to fund Dr. Federici's evaluation of Kasey and to pay
for the family's travel costs, meals, and lodging incurred during
their trip to Virginia.  For their part, Kasey's parents agreed:

- that once Dr. Federici completed his report, the
  District would have the "right (but not an obligation)
  to evaluate Kasey with up to three qualified examiners
  of its choice,"
- that the only restriction placed on the District's
  evaluations was that they must "be conducted consistent
  with all applicable laws, regulations and policies,"
- to authorize both Dr. Federici and Dr. Afshar to
  disclose their records relating to Kasey's evaluation
  to certain District representatives, and
- to "waive their right to bring a claim against the []
  District for failing to file a timely request for due
  process based on the parents' November 5, 2004
  rejection of the [] District's proposed IEP, placement
  and evaluation."

(AR, SD Doc. 10408-09).

In the months following their agreement, Dr. Federici
completed his evaluation.  By the beginning of the spring semester
of Kasey's sixth grade year, he had issued his report.  The
District, after convening an IEP meeting and discussing Dr.
Federici's methodology and results, decided to exercise its rights
under the settlement agreement to seek a second opinion on his
findings.  While Kasey's parents agreed that the settlement
agreement authorized the District to evaluate Kasey, they objected
to the evaluators chosen by the District--including Dr. Blom, Dr.
John Willis and Dr. Susan Yardley--and rejected their proposed

14

evaluations of Kasey.[11]  Over the ensuing weeks, the parties'
attempts to agree upon the terms of the evaluations repeatedly
floundered, generally deteriorating into spats over scheduling
issues or the scope of the evaluations authorized by the
settlement agreement.

**F.    Unilateral placement at the Dr. Franklin Perkins School**

The IEP team convened again in late January to consider
amending the IEP.  But because the District's re-evaluation of
Kasey was not complete, and because her parents continued to
object to the District's proposed evaluators, the District was
unable to conduct its evaluation.  By February, tensions reached
the point that Kasey's parents withdrew her from Douglass Academy
and rescinded their authorization for Dr. Federici to discuss his

---

[11]  After belatedly agreeing to portions of the proposed
evaluations, the parents attempted to impose the following
restrictions (in the parents' words) on the District and its
evaluators:
- District staff should prepare a list of questions that
  they would like answered about Kasey's educational needs,
- District staff should decide which questions should be
  addressed by each of the proposed evaluators,
- Dr. Yardley and Dr. Blom should each send us a statement
  that they understand that the purpose of their evaluations
  is to answer the questions presented to them.  They should
  also state explicitly that they understand that they are
  not authorized to and therefore will not perform any type
  of assessment of any other family members,
- All interviews with Kasey and her parents will be
  videotaped and the tape will be given to the parents
  immediately following the interview,
- No interviews or visits will take place in our home.
(AR, SD Doc 20319).

evaluation with the District.  Her parents also notified the
District that they intended to enroll her at the Dr. Franklin
Perkins School (the "Perkins School"), a private school located in
Lancaster, Massachusetts specializing in treating disabled
children.  On March 7, 2005, Kasey's parents unilaterally placed
her in the residential program at the Perkins School.  After
several months of diagnostic testing, Kasey was transitioned into
its day program.

Kasey's parents then requested another due process hearing,
this time seeking reimbursement for the costs of Kasey's private
school education.  In their complaint, the parents alleged that
the District committed various procedural and substantive
violations which denied Kasey of a FAPE.  At the hearing, the
District refuted the parents' claims with various witnesses who
testified that Kasey made satisfactory progress, both academically
and socially, while attending the District's schools.  Following
the presentation of testimony and evidence, the hearing officer
ruled in favor of the District, concluding that:

> The District's 11/5/04 IEP is found to be
> reasonable and appropriate to provide FAPE
> and to enable [Kasey] to make reasonable and
> appropriate educational progress during the
> 2004-2005 school year with [Kasey] placed in
> the local public school based on the status
> of the evaluations available to the [IEP]
> Team at that time.  The District is the
> prevailing party regarding involving Parents
> in the procedural process, the offer of IEP

                    and the appropriateness of the offered public
                    school placement.

(AR, Vol. 10, Hearing Officer's 5/24/05 decision, at 1-7).  The

hearing officer further ruled that all 12 of the parents' alleged

procedural violations were without merit.  On August 23, 2005, the

parents filed this appeal.[12]


III. **ANALYSIS**

      Kasey's parents argue that the District committed various

procedural violations during the IEP process, that the IEP

proposed on November 5, 2004 was not reasonably calculated to

offer a FAPE, and that the Perkins School was an appropriate

placement.  They contend that, because the District failed to

provide Kasey with a FAPE in a timely manner, they "acted

reasonably by unilaterally placing Kasey at Perkins to provide her

with an education appropriate to her needs," and are therefore

entitled to reimbursement.

_____

      [12]  Subsequent to the filing of the parents' appeal, the
District learned that one of the witnesses it presented at the due
process hearing had lied regarding her certification to teach
special education.  With the District's consent, Kasey's parents
re-opened the due process hearing to determine whether the false
testimony was material to the prior hearing officer's decision.
After hearing from both sides, the hearing officer concluded that
this false testimony "did not result in a denial of FAPE" to Kasey
and upheld the prior decision.  (AR, Vol. 16, Hearing Officer's
decision on Parents' motion to reopen, at 7-8).

A.   **Statutory scheme**

Congress enacted the IDEA as part of an "ambitious federal effort to promote the education of handicapped children." Rowley, 458 U.S. at 179; see also Five Town, 513 F.3d at 284.  Its purpose is "to ensure that all children with disabilities have available to them appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d).  The IDEA created a federal grant program to aid the states in educating disabled children.  See id. § 1412(a)(1)(A).  In order to receive these funds, states must provide all disabled children with an opportunity to receive a FAPE.  See Rowley, 458 U.S. at 176.  In conformity with the applicable federal guidelines, New Hampshire administers those funds through the state Department of Education and its local school districts.  See N.H. Rev. Stat. Ann. § 186-C:3.

School districts in New Hampshire are required to convene an IEP team meeting to tailor an IEP for each student in need of assistance.  See 20 U.S.C. § 1414(d); N.H. Rev. Stat. Ann. § 186-C:5.  A school district meets its obligation to provide a FAPE "so long as the program that it offers to a disabled student is 'reasonably calculated' to deliver 'educational benefits.'"  Five Town, 513 F.3d at 284 (quoting Rowley, 458 U.S. at 216).  While "IEPs are by their very nature idiosyncratic," Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 20 (1st Cir. 2003), "[o]ne

18

thing is clear:  the substance of an IEP must be something
different than the normal school curriculum and something more
than a generic, one-size-fits-all program for children with
special needs."  Lessard, 518 F.3d at 23.  Importantly, however,
"[t]he IDEA does not place school systems under a compulsion to
afford a disabled child an ideal or an optimal education."  Five
Town, 513 F.3d at 284.

> The IDEA does not promise perfect solutions
> to the vexing problems posed by the existence
> of learning disabilities in children and
> adolescents.  The Act sets more modest goals;
> it emphasizes an appropriate, rather than an
> ideal, education; it requires an adequate,
> rather than an optimal, IEP.  Appropriateness
> and adequacy are terms of moderation.  It
> follows that, although an IEP must afford
> some educational benefit to the handicapped
> child, the benefit conferred need not reach
> the highest attainable level or even the
> level needed to maximize the child's
> potential.

Lenn, 998 F.2d at 1086.  Stated differently, while disabled
students are undoubtedly entitled to receive an appropriate
education, the IDEA "does not imply that a disabled child is
entitled to the maximum educational benefit possible."  Lessard,
518 F.3d at 23.

Where a state fails to provide a FAPE in a timely manner, the
parents of a disabled child have the right to seek reimbursement
for private school tuition.  See Burlington v. Dep't of Educ. of
Mass., 471 U.S. 359, 370 (1985).  The Supreme Court has made

clear, however, that parents like Kasey's who unilaterally change their child's placement without the consent of state or local school officials "do so at their own financial risk," see id. at 374, and are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act."[13] Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993)(emphasis in original); see also Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d  21, 26 (1st Cir. 2002).  If a school district has been "unable to furnish a disabled child with a FAPE through a public school placement," the school district "will be responsible for the reasonable costs incident to that private placement."  Five Town, 513 F.3d at 285.

––––––––––––––

[13]   The IDEA provides:

(ii) Reimbursement for private school placement.  If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C).  School districts that "want to avoid reimbursing parents for the private education of a disabled child can do one of two things:  give the child a [FAPE] in a public setting, or place the child in an appropriate private setting of the State's choice."  Florence County, 510 U.S. at 15.

20

**B.    Procedural challenges**

The Supreme Court has prescribed a two-part test for analyzing a challenge to an IEP based upon alleged procedural violations.  See Rowley, 458 U.S. at 206-07.  "First, has the State complied with the procedures set forth in the Act?  And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  Id.  The court of appeals instructs "that the first part of this test is more instructive than dispositive and that compliance with the second part is likely to nullify a violation of the first."  Sanford Sch. Comm. v. Mr. and Mrs. L, No. 00-CV-113, 2001 WL 103544, at *6 (D. Me. Feb. 1, 2001) (citing Town of Burlington v. Dept. of Educ., 736 F.2d 773, 788 (1st Cir. 1984)).  Procedural violations will undermine an IEP only if there is "some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  Roland M., 910 F.2d at 994; see also DiBuo v. Bd. of Educ., 309 F.3d 184, 190 (4th Cir. 2002) (noting that courts must assess whether a procedural violation compromised a student's right to a FAPE "or whether, on the other hand, it was a mere technical contravention of the IDEA").

21

Kasey's parents allege that, during the formulation of
Kasey's IEP, the District failed:  (1) to comply with the hearing
officer's order that Kasey be home-schooled; (2) to conduct
Kasey's educational evaluation in good faith; (3) to offer Kasey
an IEP once Dr. Federici completed his independent evaluation; and
(4) failed to provide written prior notice of its decision to deny
the parents' request for an IEP.[14]

The first procedural flaw put forth by the parents is that,
despite the hearing officer's order that Kasey be home-schooled,
the District threatened to file truancy charges against them
unless they either enrolled Kasey in public school or registered
her with the state as a home-schooled student.  The parents do not
dispute that state law requires that parents notify the state if
they intend to home-school their child.  See N.H. Rev. Stat. Ann.
§ 193-A:5.  Because they believed that registering Kasey with the
state would have rendered her ineligible for a FAPE,[15] their
argument goes, the threat of truancy charges somehow translated
into the denial of a FAPE.  For its part, the District

---

[14]  Although styled as "procedural" flaws, the parents also
claim that (1) the District failed to develop an IEP reasonably
calculated to offer a FAPE; and (2) the hearing officer failed to
carefully consider the arguments raised at the hearing.  As these
are substantive--and not technical--claims, they are incorporated
into the court's discussion of the reasonableness of the IEP that
was offered.  See supra Part III(C).

[15]  It is not clear from the record what lead the parents to
this erroneous legal conclusion.

acknowledges that New Hampshire law is unclear on whether a student who has been ordered to be home schooled--as opposed to a student whose parents have voluntarily opted to do so--must be registered with the state.  The District's director of special education even testified at the due process hearing that, due to the lack of clarity in the law, the District had discussed the potential for truancy charges as the parents' actions--at least ostensibly--violated New Hampshire home-schooling laws.[16]  (AR, Vol. 11, Transcript of 5/11/05 due process hearing, at 40).  This court cannot agree with the parents, however, that because New Hampshire law was ambiguous as it applied to this particular situation, the District's attempts to comply with its own understanding of the law denied Kasey access to a FAPE.

The parents also maintain that the District violated the IDEA by interfering with Kasey's independent evaluation.  Specifically, they claim that the District imposed overly restrictive conditions on Dr. Afshar's independent evaluation, which the hearing officer had ordered, and held Dr. Federici to a school district policy that was not yet in effect.  They contend that the delay in Kasey's independent evaluation "deprived them of information

---

[16]   While the District admits that truancy charges were discussed in a non-public setting, it vehemently denies having "threatened" Kasey's parents with such charges.  (AR, Vol. 11, Transcript of 5/11/05 due process hearing, at 40).

necessary for meaningful participation in the decision making process" and contributed to Kasey's denial of a FAPE.

As the court of appeals noted in Five Town, "Congress deliberately fashioned an interactive process for the development of IEPs.  In so doing, it expressly declared that if parents act unreasonably in the course of that process, they may be barred from reimbursement under the IDEA."  513 F.3d at 288; see 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that "[t]he cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents").  Indeed, "[w]ithout some minimal cooperation [from the child's parents], a school district cannot conduct an evaluation of a disabled child as is contemplated under the IDEA."  Patricia P. v. Bd. of Educ., 203 F.3d 462, 468 (7th Cir. 2000).

The record shows that while Kasey's parents attended her IEP team meetings and were allowed to raise their ideas, issues, and concerns, they unreasonably withheld their cooperation in developing her IEP:  they objected to all of the evaluations proposed by the District; they breached the clearly-worded settlement agreement permitting the District to have Kasey evaluated by up to three of its own evaluators; and they insisted upon unreasonable conditions that the District could not agree to, such as requiring that the District waive its right to see the independent evaluators' records.  Based on the evidence in the

record, this court concludes that the parents acted unreasonably during the IEP process.  As any delay in the development of Kasey's IEP is substantially attributable to her parents' conduct, this alleged procedural flaw did not violate the IDEA.

Another procedural violation posited by Kasey's parents is that once Dr. Federici completed his evaluation, the District refused to offer Kasey an IEP.  But, "[i]f a student's parents want [her] to receive special education under IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation." Andress v. Cleveland Indep. Sch. Dist., 64 F.3d 176, 178 (5th Cir. 1995); see also Five Town, 513 F.3d at 288.  The claim that the District could have, and should have, proposed an IEP to Kasey before it reevaluated her not only ignores her parents' legal obligation to cooperate in the IEP process, it ignores the settlement agreement expressly permitting the District to reevaluate Kasey with its own specialists following Dr. Federici's evaluation.  As part of that agreement, the parents waived their right to bring a claim against the District with respect to the November 5, 2004 IEP until "such time as the evaluations described herein are complete . . . ."  (AR, SD Doc. 10409).  As Kasey's parents effectively stalled the very IEP formulation process they had agreed to with the District, the court sees no merit in their

claim that the District's refusal to offer an IEP denied Kasey a FAPE.

The final procedural flaw alleged by the parents is that, prior to the February 14, 2005 IEP meeting, the District failed to provide written notice that Kasey would not be offered an IEP. Because they were not notified of the District's adverse decision in advance of that meeting, they argue, they attended the meeting not knowing what "evaluations the District felt were still required in order to offer Kasey an IEP and why the District believed an IEP could not be offered based on the information that was available."  This court agrees with the hearing officer's rejection of this claim because Kasey's parents had long been aware that an IEP would not be offered until the District had an opportunity to evaluate Kasey.  Indeed, in the months following their rejection of the November 5, 2004 IEP, Kasey's parents were mired in an ongoing dispute with the District over the fact that it would not offer an IEP based solely on Dr. Federici's report. While they may not have agreed with the evaluators proposed by the District--or, may simply have regretted entering into the settlement agreement in the first place--they do not dispute that that agreement entitled the District to conduct its own evaluations before Kasey would be offered an IEP.[17]

---

[17]   Nor do Kasey's parents argue that the evaluations proposed by the District violated the settlement agreement

The preponderance of evidence in this case establishes that the alleged procedural violations neither compromised Kasey's right to a FAPE nor denied her parents the opportunity to participate in the decision-making process.

### C.   **Substantive challenges**

In the weeks before the Mont Blanc IEP expired,[18] Kasey's IEP team developed and presented the November 5, 2004 IEP, which Kasey's parents rejected.  Now challenging that IEP as inappropriate and not reasonably calculated to provide Kasey a FAPE, the parents argue that because Kasey was not provided an adequate education at Douglass Academy, her placement at the Perkins School was appropriate under the IDEA.

### 1.   **Educational benefit**

The thrust of the parents' challenge is that the final written version of the proposed November 5, 2004 IEP did not provide for "pull-out services" in math, organization, and study skills--the areas most affected by Kasey's disabilities.  This argument fails for two reasons:  (1) in prior discussions with the

provision requiring that evaluations "be conducted consistent with all applicable laws, regulations, and policies."

[18]  The final agreed-to IEP was the Mont Blanc IEP, which went into effect on March 19 2004, and was scheduled to expire on October 29, 2004.  The District implemented this IEP both during Kasey's tenure at Mont Blanc, and, following her withdrawal, during her short enrollment at Douglass Academy.

District, Kasey's parents objected to the implementation of pull-out services; and (2) even without pull-out services, the proposed IEP was reasonably calculated to confer a FAPE.

In the IEP team meetings leading up to November 5, 2004, the District discussed various services with Kasey's parents designed to address her disabilities, including many services that had not been offered under the Mont Blanc IEP.  (AR, Transcript of 11/5/04 IEP meeting, at 5, 24, 48-51).  During these discussions, Kasey's parents stressed, among other issues, that Kasey needed to be educated in a smaller class setting for the entire, and not just part of, the school day by teachers that understood her disabilities.  In an attempt to address these concerns, the District offered to mainstream Kasey for the majority of her schooling, but to allow her to spend time in the school's smaller resource room for math instruction, test-taking in all academic areas, preparation for all tests, transitional periods, and study skills.  Kasey's parents ultimately objected to placement in the resource room.  The District therefore did not include pull-out services as part of the proposed IEP.  Based on a review of the record, the court agrees with the hearing officer's conclusion that Kasey was offered the very pull-out services that her parents claim were not made available.  See Roland M., 910 F.2d at 995.

Even assuming, contrary to this evidence, that the District had refused to offer pull-out services, the court agrees with the

hearing officer that the IEP proposed on November 5, 2004 was
nevertheless reasonably calculated to provide a FAPE.[19]  This
conclusion is based not only on the court's deference to the
hearing officer's educational expertise, but also on the wide
array of services offered to Kasey coupled with the objective
academic progress she made under the Mont Blanc IEP.  See Rowley,
458 U.S. at 203.  In Rowley, the Supreme Court addressed whether a
hearing-disabled student's proposed IEP was likely to provide her
with the educational benefits necessary to satisfy the IDEA.  See
id. at 202-205.  There, because the student was "mainstreamed,"
the Court focused on the student's academic achievement and grade-
to-grade advancement in determining whether she would benefit from
her IEP.  See id. at 203.  Noting that the student's IEP provided
for various services specifically addressing her disability, such
as one hour of individualized instruction from a tutor for the
deaf each day, and three hours each week with a speech therapist,
see id. 458 at 184, the court found that the student's
demonstrative progress, when considered along with the school's

---

[19]  In Five Town, the First Circuit noted, without deciding,
that when reviewing the appropriateness of a proposed IEP, some
courts will only consider the final version of the IEP offered by
the school district.  513 F.3d at 285.  However, the court found
that "[i]f there is no last, best offer -- that is, if the parents
have initiated the adversary process in advance of the development
of a final IEP -- it makes very little sense to consider only the
latest version of the IEP."  Id. at 286.

proposed services, established that she had been provided with a
FAPE.  See id. at 203 n.25.

Here, the record bears out the District's argument that the
proposed IEP, which contained many services that were not
contained in the earlier Mont Blanc IEP, was reasonably calculated
to provide Kasey with a FAPE.  Under the Mont Blanc IEP, which
remained in effect once the November 5, 2004 IEP was rejected--
and, which provided for neither pull-outs, nor a special education
teacher--Kasey made marked academic and social progress.  In the
most telling indicator of Kasey's educational progress under the
Mont Blanc IEP, Dr. John Willis, an assessment specialist,
conducted longitudinal achievement testing of Kasey between April
2003 and March 1, 2005.  Dr. Willis concluded that, during this
two year span, Kasey made academic progress and scored "within the
broad average range" on a variety of his tests.  (AR, SD Doc.
30075).

Several of Kasey's special education specialists and teachers
echoed Dr. Willis' conclusions.  According to Susan Lyons, Kasey's
classroom teacher at Douglass Academy, Kasey's academic
performance under the Mont Blanc IEP was commensurate with that of
her non-disabled peers in all subjects other than math, and
allowed her to receive passing grades in all of her classes.  (AR,
Vol. 11, Transcript of 5/11/05 due process hearing, at 55).  Mrs.
Lyons also felt that Kasey, a newly enrolled student, interacted

well with other students and managed to establish a number of relationships.  <u>Id.</u>  Kate Bernier, Kasey's longtime therapist, testified that while Kasey potentially could benefit from smaller class sizes, she did not disagree with Dr. Willis's assessment of Kasey's academic progress.  In a letter to the District written just days before the November 5, 2004 IEP was proposed, Ms. Bernier wrote that Kasey "has made significant gains" in "most of the targeted areas," and that "the prognosis for continuing progress is very good."  (AR, SD. Doc. 10338-10339).  In yet another indicator of Kasey's ability to succeed under the Mont Blanc IEP, Kasey's progress report from Douglass Academy graded her as "above average" in four of her five academic subjects: reading, language, science, and social studies.  In math, the one subject in which Kasey had a diagnosed learning disability, she received a grade of "average."

The hearing officer correctly concluded not only that the District developed an IEP that improved upon her already successful Mont Blanc IEP, but that Kasey's parents' insistence on additional services requested more than the IDEA required.  The November 5, 2004 IEP sufficiently provided for Kasey to receive an educational benefit.

**2.   <u>Placement at the Perkins School</u>**

Even if the IEP proposed to Kasey was inadequate to meet her special needs, her parents are not entitled to reimbursement because the Perkins School was not the least restrictive environment available for her to receive a FAPE.  <u>See</u> <u>Roland M.</u>, 910 F.2d at 992 ("Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loath to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs.").  As stated earlier, in order to obtain reimbursement for a unilateral placement, parents must prove not only that the IEP proposed by the District was inappropriate, but that the private placement chosen by the parents was itself appropriate.  <u>See</u> <u>Florence County</u>, 510 U.S. at 15.  "A private placement is proper if it (1) is appropriate, i.e., it provides significant learning and confers meaningful benefit, and (2) is provided in the least restrictive educational environment." <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 276 (3d Cir. 2007) (internal citations omitted).  Kasey's parents make no argument as to why the Perkins School was the least restrictive environment for Kasey; rather, they continually emphasize the reasons why the Perkins School was well-suited to educate Kasey, and highlight the academic progress she made at that school.  <u>But see</u> <u>Rafferty</u>, 315

F.3d at 26-27 (noting that "[e]ven if the child makes academic progress at the private school, that fact does not establish that such a placement comprises the requisite adequate and appropriate education") (internal citation omitted).  For the following reasons, the court finds that less restrictive options were available where Kasey could have, and previously had, received a FAPE.

"It is common ground that the IDEA manifests a preference for mainstreaming disabled children," Five Town, 513 F.3d at 285; see also Rowley, 458 U.S. at 202, and "[t]o the maximum extent possible," disabled children should be offered a FAPE in the "least restrictive environment."  20 U.S.C. §§ 1412(a)(4), (5); see Five Town, 513 F.3d at 285.  In other words, disabled children should be "educated with children who are not disabled," and special classes or separate schooling should occur only when an appropriate education cannot be provided in "regular classes with the use of supplementary aids and services."  20 U.S.C. § 1412(a)(5)(A); but see Lamoine Sch. Comm. v. Ms. Z., 353 F. Supp. 2d 18, 31 (D. Me. 2005) ("an IEP can override this default in situations where the student would not receive an educational benefit at the local school").  "The goal, then, is to find the least restrictive educational environment that will accommodate the child's legitimate needs."  Five Town, 513 F.3d at 285.

Here, Kasey made appropriate educational progress in several placements less restrictive than her placement at the Perkins School--a private, out-of-state school specializing in treating disabled children.  At Mont Blanc--a private school in New Hampshire that is not certified for special education--Kasey's teachers reported that she performed at grade level and made appropriate progress.  (AR, Docs. 1760-61, 1781, 1783, 1797, 1870-81, and 1896-1906).  And, as stated above, Kasey made similar progress while enrolled at Douglass Academy, a public school within the Brookline School District.  See supra Part III(C)(1).  Even if Kasey required more intensive services than those offered in the November 5, 2004 IEP and accompanying placement proposal, which is not the case, minor adjustments likely would have brought it into IDEA compliance.  See Linda W. v. Ind. Dep't of Educ., 200 F.3d 504, 506-07 (7th Cir. 1999) (denying reimbursement after finding that the proposed IEP would have been appropriate had the services been slightly altered).  But even had the District desired to make such adjustments to Kasey's IEP, the process was derailed by Kasey's parents' refusal to cooperate with its attempts to have her evaluated by trained professionals.  See Schoenfeld v. Parkway Sch. Dist., 138 F.3d 379, 382 (8th Cir. 1998) (noting that where the school district was denied an opportunity to formulate an appropriate IEP, "it cannot be shown that it had an inadequate plan under IDEA").

34

As the record establishes that the proposed placement at Douglass Academy allowed Kasey to make educational progress, and because there is no evidence to suggest that a more restrictive placement was necessary for Kasey to obtain a FAPE, the court rules that Kasey's unilateral placement at Perkins Academy was not authorized by the IDEA.

IV.   **CONCLUSION**

For the foregoing reasons, the court finds (1) that Kasey was offered a FAPE in accordance with the IDEA, and (2) that Kasey's unilateral placement at the Perkins School was not appropriate. The New Hampshire Department of Education's approval of the District's proposed IEP, and its denial of her parents' reimbursement for the costs of her private education are affirmed. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  December 5, 2008

cc:  Theresa Kraft, Esq.
     Dean B. Eggert, Esq.

35